### GUILMARTIN v. SOLVAY PROCESS CO.

(Supreme Court, Appellate Division, Fourth Department. November 14, 1906.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—FELLOW SERVANTS—CHARACTER OF ACT OF FOREMAN.

Where a belt became entangled, and while the foreman was attempting to loosen it, and directing the plaintiff in assisting him, the foreman severed the belt, so that plaintiff was caught and injured, the injury was caused by the foreman's act as a fellow servant, and not by his superintendence of the work, so that as matter of law the master was not liable

either at common law or under the employers' liability act (Laws 1902, p. 1748, c. 600).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 452.]

2. SAME—PROXIMATE CAUSE OF INJURY.

Where plaintiff was caught by a belt which had become entangled and was loosened by a foreman, and was injured in a manner not within the experience of any of the operatives of the factory where the accident occurred, the accident was one which could not reasonably have been anticipated, and hence the master was not liable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 163.]

Kruse and Spring, JJ., dissenting.

Appeal from Trial Term, Onondaga County.

Action by Dennis Guilmartin against the Solvay Process Company. From a judgment in favor of plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

Louis L. Waters, for appellant.
A. Lee Olmsted, for respondent.

NASH, J. The action was brought under the employers' liability act (chapter 600, p. 1748, Laws 1902) for injuries alleged to have been caused by the negligence of the defendant. The defendant is a manufacturing corporation, having its place of business in the village of Solvay, Onondaga county, engaged in the manufacture of soda ash and chemical products. The plaintiff at the time of the accident was in the employ of the defendant. He had worked for the defendant 15 years and for 10 months before the accident as oiler in that part of the defendant's works known as the "densification department." His duties as an oiler were to oil the shafting, keep the boxes through which the shaft runs full of oil, so they would not burn, and put the belts on and take them off. He had the oiling and charge of the machinery in the top of the building. He was working on an eight hour a day shift—from 11 o'clock at night until 7 the next morning. His work at that time was in the dense soda department. In this department there is a straight line engine, located at the north end of the building, on which are two driving wheels, connected by a belt with the north end of the main shaft, extending north and south through the building, about 20 or 30 inches above the engine. The shaft at the point where it is connected with the engine is between 5 and 6 inches in diameter and 1½ feet long. A 6-inch belt ran from the wooden pulley over to a countershaft, about 15 feet east of the main shaft and 5 or 6 inches higher than the shaft. Upon the countershaft, which ran parallel to the main shaft, were two 3-foot wire pulleys on which the belt ran, one a loose and the other a tight pulley. When the belt was on the tight pulley, that caused the countershaft to revolve. There is a platform consisting of three or four planks running along on both sides of the main shaft for the men to walk upon, extending over to the countershaft, so that there was a floor between the two shafts. The

main shaft is about 4 inches above the plank of the platform under-
neath. The belt extending from the wooden pulley on the main shaft
to the pulleys on the countershaft passed the upperside of it over the
platform and the underside beneath it. The belt was a leather belt,
sewed together by means of a wire lacing on each end, which interlock-
ed, and a piece of rawhide passed through. When pressure came on
the belt, it pulled the ends apart, so that the rawhide held them to-
gether. To take the belt apart it was necessary to pull the rawhide out
of the wire lacing. The engine operating the main shaft also operated
the soda furnace. A shut-down of the furnaces tends to cool them and
crack the brickwork. The main shaft was operating the machinery
connected with the apparatus room. It was also connected with ma-
chinery in the packing room. There were conveyors which, if stopped
suddenly, would become plugged with soda and give trouble, and the
supply of bicarbonate to the driers would be cut off, necessitating the
services of a large gang of men, arranged for beforehand in case the
engine is required to be shut down.

The shift foreman, except in the case of accident, had no power to
shut down without permission from a superior officer. The defendant
had made and promulgated a rule, which was known to the plaintiff
and to the shift foreman, which provided that "belts must not be
thrown off while in run if there is anything near enough to the pulley
for the belts to catch on." On the night of the accident Michael
Mullin was the shift foreman. He had been in the defendant's employ
20 years and was concededly competent. On his shift that night there
was a head foreman, James Fogarty, whose position was in the ap-
paratus room, in the same building. He was in charge of all the work
in the soda ash department. Mullin was required to go to him for au-
thority to shut the engine down. On the night of the accident, which
occurred about midnight, the belt extending from the wooden pulley
to the countershaft stopped running. There is no claim that the stop-
page of the belt was caused by any negligence of the defendant. The
plaintiff in his testimony, describing the accident, says that, when his
attention was first called to the belt, he was at the south end of the main
shaft; that Mullin called his attention and motioned toward the north
along the main shaft. The plaintiff walked along down the platform
and saw that the belt was off the wooden pulley on the main shaft. The
belt was between the wooden pulley and an iron patent box, which was
five or six inches from the pulley. On the countershaft the belt was
partly on the loose pulley and partly on the tight pulley. The main
shaft being in operation at its usual speed, Mullin was down on the
floor below at this time. He said, "Put that belt on, boys." Pever,
another oiler, came up from the floor below. The plaintiff, giving an
account of the accident, testified:

"Mr. Pever came there. When he got there, I told Mr. Pever to throw that
belt off the iron pulley on the countershaft, so we would get a little slack to
bring the belt over the wooden pulley. As soon as he threw it off, as soon
as he gave the slack, the belt fell onto the floor, doubled around the wood-
en pulley, pulled it out of my hands. I had my hand ahold of the belt
when he was taking it off from the pulley. I took hold of the box to raise it
off of the shaft. When he gave slack off the iron pulley over on the
countershaft, I don't know whether he dropped it or whether it was taken out

of his hand. It slung right onto the floor and came right up doubled around the pulley. The pulley stood still on the shaft. It pulled the belt tight from the countershaft to the main shaft; held it tight, so the belt and wooden pulley stood still. The main shaft went revolving in the wooden pulley. * * * There were three doubles of the belt on the pulley. It wound right around underneath, so that two belts were wound right fast over the wooden pulley. * * * I went down and told the foreman, Mike Mullin. I told him that the pulley was loose; that the belt had gone around it. He said, 'Let me see.' He went along right upstairs. I went with him. When he went up he said, 'It is burning.' I said, 'It smokes a little.' I asked him how he was going to shut down—if he was going to shut down to get the belt off and fix the pulley. He went downstairs. He said nothing in reply. While he was gone, I stood right near the wooden pulley. He turned back and brought the fireman with him. He came back onto the platform. I could not say what the fireman's name is. We used to always call him 'John.' During the time that I was waiting for the foreman to come back, Mr. Pever stayed there with me, too. Before they did get back, I asked him if he would go downstairs and shove the belts on the loose pulley—asked Mr. Pever, the other oil man with me. He was working down on the bottom floor. * * * When Mullin and John, the fireman, and Pever came back, they were all four on the platform together. Mr. Mullin, he says, 'Boys, cut that belt.' He said, 'That pulley is burning.' 'All hands,' he said, 'get hold of it.' 'Get hold of it,' he says, 'and pull the rawhide out.' I took hold of the belt, and he took hold of it. John and Steve, the other oiler, and the fireman, took hold of it. All four took hold of the belt; me and Mullin and the fireman and the other oiler. * * * Mullin was on the other side of the belt next to me. John was on the other side with the foreman, Mr. Mullin; on the same side of the belt the foreman was on. He was to the east side of the fitting piece. I was on the west side of it. Steve was on my side, on the east side of the fitting piece. In that position we all took hold of the belt together. Me and the foreman, Mr. Mullin, pulled east, Steve and John pulled west, so that relieved the fitting piece. They took pliers. I think Steve took them. He used to always carry them. They kept them downstairs, but he had them that night in his pocket. He took hold of the rawhide to pull it out. He could not get it out very handy. Foreman Mullin said, 'Get your knife and cut the belt.' I said, 'I have not got any knife.' He said, 'You ought to have a knife.' So, in the meantime, they pulled the rawhide out. The foreman ordered me across over the shaft. He said, 'Get over that shaft, gol darn you, get, go on, get over the shaft, and throw that belt off.' He indicated the main shaft. I went over toward the shaft. When I was going over the plank, I left the right foot on the east side of the shaft; raised my left foot to put it over the shaft. At that time the belt got around the right foot, pulled me right into the shaft. The belt we were cutting caught around my right leg. I was thrown on the back, right back on my back on the platform. Then I was taken around the shaft"—taking plaintiff's leg off above the knee.

He further testified that during the time he was employed by the defendant he had not seen a belt caught in that way. When Mullin went downstairs he ordered the engineer to slow down. The engine was slowed down as slow as it could be run with safety without entirely shutting down.

The court submitted to the jury the question whether, within the meaning of the employers' liability act, Mullin, the shaft foreman, in the work of extricating the belt, was exercising superintendence, or whether at the time of the accident he was a co-employé, engaged in a mere detail of the work, and whether or not Mullin was negligent in not stopping the machinery. There is substantially no dispute as to the manner in which the accident occurred. The witnesses differ somewhat as to some of the minor details, but as to essentials they are in accord.

Before the enactment of the employers' liability act, it was held in Crispin v. Babbitt, 81 N. Y. 516, 37 Am. Rep. 521, that:

"The liability of a master for an injury to an employé occasioned by the negligence of another employé does not depend on the grade or rank of the latter, but upon the character of the act in the performance of which the injury arises. If the act is one pertaining to the duty the master owes to his servants, he is responsible to them for the manner of its performance; but, if the act is one pertaining only to the duty of an operative, the employé performing it, whatever his rank or title, is a mere servant, and the master is not liable to a fellow servant for its improper performance."

In that case "B. carelessly let on steam, and plaintiff was injured. The court charged that although B., as agent or superintendent, represented and stood in the place of defendant, he did so only in respect to those duties which defendant had confided to him as such. Defendant's counsel then requested the further charge that as to any other acts or duties performed by B. in and about defendant's works or business he was not to be regarded as defendant's representative, but as a fellow servant with plaintiff. This the court refused to charge, but left it as a question of fact to the jury. Held, that it was a question of law, and that the court should have charged as requested."

In McCosker v. Long Island Railroad Co., 84 N. Y. 77, another case in which the rule was applied, "McCormick, plaintiff's intestate, was employed in the yard of defendant at H. P. to assist the yardmaster L. He was hired by L., was under his control and supervision. While McC. was under the direction of L., engaged in attaching a damaged car standing on a track in the yard to another car, L. negligently signaled to an engineer whose train stood upon the track to back the train, which he did, without signal or warning, and in consequence McC. was crushed between the cars, receiving injuries causing his death. In an action to recover damages, held, that the yardmaster was to be deemed a fellow servant with the deceased as to all acts done in the range of the common employment, except those done in the performance of some duty which defendant owed to its servants, that the act in question was not one of that character, and that therefore, defendant was not liable."

The employers' liability act has not changed the rule. It was held in Quinlan v. Lackawanna Steel Co., 107 App. Div. 176, 94 N. Y. Supp. 942, "that the employers' liability act must be construed to create a liability against the employer for the acts of a superintendent only when the superintendent is engaged in the act of superintending."

In the case at bar Mullin, the shift foreman, the plaintiff, Pever, the other oiler, and the fireman, John, were all acting together, engaged in the act of extricating the belt, all four participated in the work of separating the belt, all took hold of the belt together, two on either side. When it parted, Mullin directed the plaintiff to get over the shaft and throw the belt off, a detail of the work. It was part of the duties of Mullin as shift foreman to assist in the work of handling belts and other machinery about the room. The accident was caused by the separation of the belt. That was done by Mullin, the foreman, plaintiff, and the two other employés acting together as co-employés. The attempt to extricate the belt without stopping the machinery was a mere

detail of the work. Foster v. International Paper Co., 183 N. Y. 50, 75 N. E. 933. The conceded facts bring the case within the rule as held in Crispin v. Babbitt.

It may be held, further, that the accident was one which could not reasonably have been anticipated, in which case negligence cannot be attributed to Mullin. The injury to the plaintiff was occasioned not by his attempt to step over the shaft. It was caused by the end of the belt, which in some unexplained manner got around his leg and pulled him into the shaft—an unusual and extraordinary occurrence, not within the former experience of the operatives or of any witness called as an expert at the trial, characterized by the court as a "singular catastrophe," something that could not reasonably have been anticipated, and therefore within the class of cases in which it is held that the master is not liable. Fasani v. N. Y. C. & H. R. R. R. Co., 109 App. Div. 404, 96 N. Y. Supp. 415.

For these reasons we conclude that there was no question for the jury, and that as matter of law upon the evidence in the case the complaint should have been dismissed. The judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event.

Judgment and order reversed, and a new trial granted, with costs to the appellant upon questions of law only.

McLENNAN, P. J., and WILLIAMS, J., concur.

KRUSE, J. (dissenting). The plaintiff's right leg was torn from the body below the knee while he was attempting to comply with the directions of the defendant's foreman, who was in immediate charge of the work which the plaintiff was attempting to do. The plaintiff was at work in the defendant's factory. A belt ran from the main shaft to a countershaft. The belt had run off the pulleys. While an attempt to put it on was being made, it caught and wound around a wooden pulley and the main shaft and the countershaft, and was pulled tight between the two shaftings. The foreman undertook to extricate the belt without stopping the machinery. He directed the plaintiff to assist in releasing it while the machinery was in motion, in a manner the precise details of which need not be mentioned. The plaintiff complied with the directions of the foreman. He took hold of the belt, which started, caught his leg, and took him around the shaft, completely severing his leg, as has been stated. For this injury the plaintiff seeks to recover damages against the defendant, contending that the injury was caused through the negligence of the defendant's foreman, and that the defendant is liable therefor.

I do not think it can be seriously claimed that it can be said as a matter of law that the foreman was reasonably careful in attempting to extricate this belt while the machinery was in motion. The jury might well find that, if the foreman had used reasonable prudence and foresight, he would have foreseen that harm might come to the men engaged in the work, as it did come to the plaintiff, in doing what was attempted without stopping the machinery. It is, however, contended

that Mullin, the shift foreman, in whose immediate charge the plaintiff was at the time of the accident, was neither a superintendent nor engaged in an act of superintendence in doing what he did and in the manner in which it was being done. The plaintiff's testator worked in the soda ash department, in what is known as the "densification building." This department was under the general supervision of the manager of that department. In the densification building there were three shift foremen. During the daytime there was a general foreman, and in the nighttime the apparatus room foreman upon No. 1, as it was called, was responsible for the whole work of the soda ash department. Upon the night when the accident occurred James Fogarty was in general charge, and when he was upon the floor of the densification department he was in charge, and giving his orders through the shift foreman; but, when he was not present, the shift foreman was in direct charge of the department. Mr. Mullin was shift foreman upon this occasion, and, in the absence of Fogarty, had the power to run the department and had full direction and control over the men. Mullin testified that at the time of this accident he had full charge of the room. When necessary he gave the orders, and he started and stopped the machinery and gave orders to the men for whatever work they had to do, and told them how to do it. It was his duty to see how the machinery was running. He frequently had to shut down the machinery if a belt became wound around a shaft, and used his own judgment about how to extricate the belt, and to shut down, if necessary, and he would do that without consulting anybody.

In charging the jury the learned trial judge said:

"If you find by reason of his position in this company, by reason of the custom of the company and the course of its business in the past, there was placed upon this man Mullin the essential and necessary authority to take charge of the machinery and the men, and appliances of the concern, for the purpose of correcting that difficulty, and readjusting that belting and putting the machinery into running order again, if his authority went far enough to clothe him with power in his discretion to order the machinery stopped, and if in the exercise of that authority he proceeded as he did, then he was acting for the time being and for the purposes of this case in the position of a superintendent, and so far as the liability of the defendant is concerned his negligence would be the negligence of the defendant."

We think the rule as applied to the facts of this case was correctly stated, and that the evidence warranted the jury in finding the facts to bring it within the rule. The mere fact that Mullin also assisted in the manual work of extricating the belt does not change his relation to the work which was being carried forward at that time, nor relieve the defendant from the consequences of his negligence as regards the particular acts of superintendence. It was not the manual labor alone which Mullin did in doing what was done there, but the manner in which it was directed to be done, and was done, under his supervision which subjects the defendant to liability. What did the harm was the failure to stop the machinery and the directing the plaintiff and his fellow workmen to extricate the belt while it was in motion. He had full authority to shut down the machinery and to direct the men in their work. They were required to obey his orders. In the absence

of Fogarty he was in full charge of both the work and the men, and that was his principal duty. Under such circumstances, we think his omission to stop the machinery, and his attempting to extricate the belt while the machinery was in motion, and in directing the plaintiff as he did, to assist in releasing the belt, Mullin was exercising acts of superintendence, for the negligent performance of which the defendant is responsible. Faith v. N. Y. Central Railroad Co., 109 App. Div. 222, 95 N. Y. Supp. 774, affirmed 185 N. Y. 556, 77 N. E. 1186.

Other questions were raised by the defendant, but we think none of them is such as to require or justify the granting of a new trial.

We think the judgment and order should be affirmed, with costs.

SPRING, J., concurs.

