to collect from the plaintiff as one of its stockholders the amount due for a tax upon its stock, and then to pay the tax to the city. Instead of following literally the provisions of the statute, the bank did the equivalent, to wit, paid the tax from the money in its possession applicable for distribution as dividends. It was the plaintiff's property, however, which the bank paid and which the city received. It was the money to which the plaintiff was entitled as dividends from the bank. The mere fact that those dividends had not actually been paid to the plaintiff did not make them any the less its property. The payment out of the plaintiff's share in the dividend fund was a payment of its property, just as much as though the bank had actually collected from it the cash and then turned the identical money collected into the city treasury. The reasonable and fair intendment of the allegation quoted is that the money belonged to the plaintiff, a stockholder in the bank, as a part of dividends due it upon the distribution of money applicable for that purpose. The same contention now made by the appellant was raised by the defendant in the Ætna Case, supra, and in disposing of it this court said:

"It is true it was paid by a check drawn on a fund in the bank, but that such fund had been appropriated out of earnings to pay dividends, and thus under the decisions became the property of the stockholders, we think the evidence conclusively shows."

The facts thus referred to as being disclosed by the evidence in the Ætna Case are equally well established by the allegations in the complaint now before us, and such allegations must be accepted as true in passing upon the question raised by the demurrer. We deem it unnecessary to enlarge further upon this subject, or to consider more in detail the arguments of the appellant against the sufficiency of the complaint, in view of the elaborate and careful opinions both of the Court of Appeals and of this court in the Ætna Insurance Case, supra, which we regard as controlling.

The views above expressed show that in our judgment the complaint states a cause of action, and therefore that the demurrer was properly overruled, and the judgment appealed from must be affirmed, with costs. All concur.

---

(109 App. Div. 222.)

FAITH v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1905.)

1. MASTER AND SERVANT—EMPLOYERS' LIABILITY ACT—FELLOW SERVANTS—
POSITION OF SUPERINTENDENCE.

Employers' Liability Act, Laws 1902, p. 1748, c. 600, gives an employé a right of action against the employer for the negligence of any person intrusted with and exercising superintendence, whose sole or principal duty is that of superintendence, or, in the absence of such superintendent, of any person acting as superintendent with the authority or consent of such employer. The superintendent of a roundhouse had general supervision of all work, and authority to hire and discharge men, but another was foreman or inspector of boiler repairs, with a gang of men under his direction. Held, that such person, while engaged in directing boiler repairs in the absence of the superintendent, was engaged in superintendence, within the statute, as to the men under his direction.

**2. SAME—INJURIES TO SERVANT—NEGLIGENCE OF FOREMAN.**

In an action for injuries to a servant, evidence *held* sufficient to show that his foreman was guilty of negligence in failing to warn the servant of a dangerous situation known to the foreman.

**3. SAME—PROXIMATE CAUSE.**

In an action for injuries to a servant, evidence *held* sufficient to show that the negligence of the servant's foreman was the proximate cause of the injury.

**4. SAME—CONTRIBUTORY NEGLIGENCE.**

In an action for injuries to a servant, evidence *held* sufficient to show that the servant was not guilty of contributory negligence.

**5. SAME—ASSUMPTION OF RISK.**

In an action for injuries to a servant, evidence *held* sufficient to show that the servant had not assumed the risk.

Nash and Williams, JJ., dissenting.

Appeal from Trial Term, Onondaga County.

Action by Elizabeth Faith, as administratrix of the goods, etc., of J. W. Faith, deceased, against the New York Central & Hudson River Railroad Company. From a judgment of nonsuit, plaintiff appeals. Reversed.

The action was begun under the "Employers' Liability Act," so-called, being chapter 600, p. 1748, of the Laws of 1902, on the 18th day of July, 1903, to recover damages resulting from the death of plaintiff's intestate, alleged to have been caused solely through the negligence of the defendant.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

Frank C. Sargent, for appellant.
Frank Hiscock, for respondent.

McLENNAN, P. J. The accident which is the subject of this action occurred on the 17th day of March, 1903, at the roundhouse of the defendant in the village of East Syracuse, N. Y. The deceased at the time was in defendant's employ, and had been continuously for more than 20 years. He was an experienced boiler maker, was then engaged in that capacity, and was entirely familiar with the methods adopted by the defendant of doing such work. One Peters was superintendent and had general supervision of all work done at the roundhouse and of the men there employed, and had authority to hire or discharge in his discretion. There were several branches or distinct classes of work being carried on, each of which was under the immediate supervision of a foreman or inspector, and the men employed in each were under the control, and subject to the direction, of the foreman of such branch of work. One Morris was foreman or inspector of the department where engines and boilers were repaired, and the deceased, four or five other boiler makers, and two helpers were engaged in that work under him. Morris directed what work each one of them should do, and the manner of doing it. On the day in question, Morris, having discovered that the front of one of the engines was cracked, directed that it be detached from the engine and removed, which would ordinarily occupy about 20 minutes, and the deceased and two of the other boiler makers

were directed by him to do the work. The "engine front," so called, which was to be removed, is a circular casting about 6 feet in diameter, weighs about 1,200 pounds, has a door in the center weighing about 200 pounds, which swings on hinges, and the casting is fastened to the front of the boiler by means of about 40 five-eighth inch bolts extending through the casting, and a projection extending around the front of the boiler; such bolts being held in place by nuts. The method of removing such engine front long employed by the defendant was first to take out the bolts, with the exception of one at the top, which was sufficient to hold it in place, then open the door, and fasten a tackle or hoist in the opening, and then, after cutting the last bolt, hoist or swing the casting from the engine. At the time Morris directed two of the boiler makers in defendant's employ, and who were subject to his orders, to detach the engine front preparatory to its removal. They immediately commenced to take out or cut the bolts, and, while so engaged, the evidence tends to show that Morris stood near by, and was watching the progress of the work; that in his presence they removed or cut all the bolts holding the casting in place, without objection from Morris, and failed to leave one bolt to hold the casting in place until the tackle was made fast, as had been the custom and the method adopted of doing such work by the defendant. In the meantime, plaintiff's intestate had gone after the tackle or hoist with which to remove the casting. He immediately opened the door, started to fasten the tackle in the opening, when it fell upon him, and caused such injury as that his death resulted three days later. He was in no manner warned that the last bolt had been cut, or that the preparation for the removal of the casting was not the same as had always previously been made. The evidence justifies the finding that Morris, the foreman, knew that the usual method of doing such work had not been followed, and that the cutting of all the bolts before the tackle was fastened would be dangerous to the person attempting to attach the same. The evidence we think very conclusively establishes that the foreman, Morris, was guilty of negligence, and that to such negligence was due the accident. The jury had a right to find that he knew the last bolt in this heavy casting had been cut or removed, and, therefore, that any jar, or especially the weight of the door when thrown open, as was necessary in order to fasten the hoist or tackle to the casting, would cause it to fall. Yet, notwithstanding such knowledge, he permitted the deceased to go in front of it, and open the door preparatory to fastening the tackle, without in any manner warning him of the danger.

The question is whether, upon this state of facts, the defendant is liable to plaintiff for the negligence of the foreman, Morris. We may assume that at common law it would not thus be liable, but we think under the employers' liability act upon the evidence it was a question of fact for the jury whether or not such negligence was attributable to the defendant, depending only upon the question as to whether or not Morris at the time was acting as superintendent of the defendant, or at the time was acting in that capacity. The act provides, in substance, so far as it is applicable to the question

now being considered, that where personal injury is caused to an employé, who is himself in the exercise of due care and diligence at the time, "by reason of the negligence of any person in the service of the employer intrusted with and exercising superintendence, whose sole or principal duty is that of superintendence, or in the absence of such superintendent, of any person acting as superintendent with the authority or consent of such employer," the employé shall have "the same right to compensation and remedies against the employer as if the employé had not been an employé of nor in the service of the employer nor engaged in his work." We think the evidence in this case very conclusively establishes that Morris, although designated as foreman or inspector, was intrusted with and was exercising superintendence. It shows that at the time in question the general superintendent, Peters, was absent, and that Morris was acting as such with the authority or consent of such employer; such authority or consent being evidenced by the manner of doing business, extending over a period of years. The deceased and the other boiler makers were under the control of and subject to the direction of Morris as to every part of the work. He could say to one "go," and to the other "come," and they obeyed. In the case at bar two were directed to cut or remove the bolts, and the deceased was to bring the tackle, and make it fast to the casting. All was being done under his supervision. He occupied precisely the same relation to the men under him as Peters, the general superintendent, would have done had he been present. Morris was not engaged in performing a detail of the work, but was engaged in superintending the doing of an entire job. If the general superintendent, Peters, had stood by and seen a dangerous structure erected by certain employés, and had permitted another employé, who was ignorant of the danger, to go upon it without warning and thereby sustain injury, there could be no question but that the defendant would be liable for such negligence on the part of Peters. Under the plain meaning of the "act," Morris, for the time being, in the absence of Peters, stood in his place, and the defendant was likewise liable for his negligence.

It would not be profitable to discuss the cases which declare the rule of liability at common law. The clear purpose of the employers' liability act is to extend such common-law liability, and to make an employer liable to an employé for any injury resulting from the negligent acts or omissions of any other employé, no matter what his grade or rank, providing at the time he was acting as superintendent with the authority or consent of such employer, and provided such negligent act or omission relates to the duties of superintendence, and does not relate to a mere detail of the work which such acting superintendent may undertake to perform. Upon the evidence, we think the jury were justified in finding that Morris was "acting as superintendent with the authority or consent" of the defendant, and that his negligence was, under the statute, attributable to it.

It is urged that the evidence fails to show that plaintiff's intestate was free from contributory negligence, because, it is alleged, he could have known whether or not all the bolts had been removed, and there-

fore whether it was safe for him to go in front of the casting; that a glance by him would have disclosed the exact situation. The test in such cases has always been held to be, what would a person of ordinary care and prudence have done under like circumstances? In the case at bar an "engine front" was to be removed, presumably in accordance with the rules adopted by the company and with the methods for years employed by it. The deceased saw that the work was being done in the presence of an experienced foreman, who was familiar with such rule and method. When the deceased came to perform his part of the work, was he guilty of negligence because he failed to look and see whether the preliminary work done in the presence of the foreman had been properly done? The deceased was not required, in order to absolve himself from the charge of contributory negligence, to have examined and investigated, to ascertain that all his coworkers who had preceded him upon the job had properly performed their work. He had a right to assume that the foreman, who was there for the purpose, had knowledge as to that, and that he (the deceased) would not be permitted to go into a place of danger, created in the presence of the foreman, without warning from him.

Upon the question of assumption of risk by the deceased, we think the jury were amply justified in finding adversely to the defendant. We do not hold—it is not necessary to hold in this case—that cases may not arise where the evidence so conclusively establishes assumption of risk that it may be so decided as matter of law. That proposition was in no manner involved in Hoehn v. Lautz, 94 App. Div. 14, 87 N. Y. Supp. 921, decided by this court. In that case it was stated in the opinion (page 18 of 94 App. Div., page 923 of 87 N. Y. Supp.) that the intestate was himself responsible for allowing an excessive amount of steam to go into the drum, which was the cause of the accident. In this case, if we are right in our conclusion that the accident occurred through the negligence of the foreman, Morris, and that his negligence was the negligence of the defendant, the deceased did not assume such risk. At common law, if the danger was caused by the negligence of the master, and was unknown to the servant injured thereby, and could not have been ascertained by the exercise of ordinary care and prudence, there was no assumption of risk. We think the case is entirely barren of evidence tending to show that the deceased assumed the risk of the accident which befell him, unless we should hold that he assumed the risk of the negligence of Morris, who, as we have held, was for the time being the alter ego of the defendant. We think such was not the rule even under the common law, and certainly not under the employers' liability act.

We conclude that, upon a fair consideration of the evidence in this case, the jury were entitled to find, as it did under the very fair and impartial charge of the court, to which no exception was taken by the defendant, that the defendant was guilty of negligence which caused the injury, that the plaintiff's intestate was free from contributory negligence, and that he did not assume the risk.

No question was made by respondent's counsel upon this appeal that the verdict is excessive.

We conclude that the judgment entered upon the nonsuit should be reversed, with costs, and that judgment should be directed in favor of the plaintiff upon the verdict of the jury, with costs.

Judgment appealed from reversed, with costs to the appellant, and judgment ordered in favor of the plaintiff upon the verdict of the jury, with costs. All concur, except NASH, J., who dissents in an opinion in which WILLIAMS, J., concurs.

NASH, J. (dissenting). I do not think that it can be properly said that the position of Morris, the foreman in charge of the work in which Faith was employed, was that of superintendent, or that he was at the time that Faith received the injury which resulted in his death, within the meaning of the employers' liability act, a person exercising superintendence, or whose sole or principal duty was that of superintendence. He was foreman of the boiler makers under direction of Peters, the general foreman, from whom Morris received his orders and distributed the work among the men under him. Morris worked with the boiler makers, looked after the work, and inspected boilers. His labor of inspecting boilers was that when the fire was out of the boiler —out of the fire box—and it was cold, he examined the stay bolts and flues. "He gets into the boiler, and looks it over, and determines whether it needs repairs or not. In case he decides that some repairs are needed on the boiler, he gives instructions to the men to make the repairs." He inspected all the boilers that came in. There were about 50 or 55 boilers for him to look after every day, to give them external inspection. He inspected on the average 15 or 20 on the inside daily. He set the boiler makers at work on any particular boiler. He did not stay with them until they finished their work. He would go about to the different men and different engines. In the ordinary course of business, he would have some of them working on one job and some on another. At the same time he was about the shop, looking after the next job. When their work in repairing a boiler was done, Morris inspected it, and, if he did not think it was done right, he made them do it over or fix it. This is the evidence of Peters, the general foreman.

There is no question as to the character of the work in which Morris was engaged. He says:

"My position at the time was foreman of boiler makers. I inspected all locomotives that came in from the east and west on both divisions, and looked after giving out the work and seeing that it was done properly. I did not do any of the repairing myself at that time. I did all the inspecting myself. In inspecting I used a hammer. It was my business, in the ordinary course of events down there, to get inside of those boilers with a hammer to see how they looked, and whether they were sound and in order or not; and I inspected them on the outside. I did not hammer them any on the outside to do that. In the course of inspection, I also looked at the stay bolts and different parts. The work in doing that inspection, as I have described, was the manual labor that I did. If I found anything the matter with a boiler, I gave the work to some boiler maker under my charge. I couldn't stand right over one job when I had different men to look after. I was around from one to another, and inspecting the engines as they came in. The engines had to be inspected immediately after their arrival. I was not there when they commenced working on that engine on which Mr. Faith was hurt. The engine had a bursted flue, and that necessitated the removal of the front.

I told these men to remove it, Elmer Depan, John Faith, and Mike Kelley. I say I was not present when they began their work. When I first saw it, when I got there, Depan was taking off the nuts. He had got two or three off when I went by the front first. I went down to the dump pit then to inspect an engine. That was about 300 feet from where this engine stood, I should judge. I couldn't say just how long I was down there. At that time, when I went by this engine first, and Depan was taking off the first of the nuts, Kelley was also there, Kelley and Depan. Faith was not there at that time; he came later on. I might have been down to the pit making that inspection fifteen or twenty minutes. Then I went back to the roundhouse. I passed by this engine. I went to look after another job in the roundhouse then. It was over in the other roundhouse—the eastern roundhouse—where I went then. That was the second time I passed and saw this job. I came back again before this job was finished. With reference to the number of nuts removed, the second time I saw it, Depan was up on top, and Faith stood right in front, and had about, I should say, six or seven nuts yet to remove. I did not see it again before it fell."

Clearly within the case of Vogel v. American Bridge Co., 180 N. Y. 373, 73 N. E. 1, Morris was not the alter ego of the defendant; on the contrary, a fellow workman with Faith, the part taken by the latter being a mere detail of the work in which they were both employed.

The judgment should be affirmed.

WILLIAMS, J., concurs.