The finding of the jury upon this question of settlement and release was supported by the evidence, and should not be set aside as contrary to or against the weight of the evidence.

Judgment and order affirmed with costs. All concur.

(118 App. Div. 536)

### MIKOS v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 6, 1907.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—FELLOW SERVANTS—PERSONS ENGAGED IN SUPERINTENDENCE.

One employed by a railroad, and having charge of the work of cleaning ashes from locomotives in the absence of the regular superintendent or foreman, and who had control of the men and directed them in the work of handling the engines, was acting as a superintendent, within Employer's Liability Act, Laws 1902, p. 1748, c. 600, making a master liable for injuries to a servant arising from the negligence of any person exercising superintendence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 371-373, 427, 428.]

2. SAME—NEGLIGENCE OF SUPERINTENDENT.

Employer's Liability Act, Laws 1902, p. 1748, c. 600, makes a master liable for injuries to a servant arising from the negligence of any one in the employment and exercising superintendence. A hostler, while eating his dinner, at some distance from the ashpit over which locomotives were cleaned, was told by the one who had charge of the cleaning of the locomotives that a locomotive standing over the ashpit had been dumped, and was ready to be moved and directed him to move it as soon as possible. The hostler moved the locomotive without taking any steps to warn plaintiff's intestate, who was beneath the locomotive, and it was shown that it was almost the invariable practice for an engineer, before taking an engine from the ashpit, to ascertain if the work of cleaning the engine had been finished, and, if not, to give the cleaner warning. Held, that the hostler had a right to rely on the statement of the superintendent, and the facts warranted a finding of negligence on the part of defendant.

McLennan, P. J., dissenting.

Appeal from Trial Team, Erie County.

Action by Julia Mikos, as administratrix of the estate of John Mikos, deceased, against the New York Central & Hudson River Railroad Company. From a judgment in favor of plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, and ROBSON, JJ.

Charles A. Pooley, for appellant.
H. J. Swift and Frank E. Wade, for respondent.

SPRING, J. The complaint sets out, and the proof tended to establish, a cause of action within the employer's liability act (chapter 600, p. 1748, Laws of 1902). The plaintiff's intestate was in the employ of the defendant, engaged in cleaning the engines from ashes in an ashpit provided for that purpose. This ashpit was connected with the defendant's yards at East Buffalo, was constructed of cement, and adaptable for the purpose intended. It was the practice to run cars,

from which the ashes needed dumping, on tracks over these pits, and men crawled under the engines and scraped out the ashes with a hoe, and plaintiff's intestate had been doing that work for some time. On the 21st day of November, 1905, at about noon, an engineer of the defendant ran on one of these tracks two engines coupled together; the first one a live engine, and the one in the rear a dead crippled engine.

A man named Illman was in charge of this branch of the business on that day, in the absence of the regular superintendent or foreman, and he always acted in that capacity when the superintendent was not present. Illman had control of the men, directed them in the work of handling these engines, decided whether they should be dumped, when and where to be removed, and within his sphere was in supreme command. He was, therefore, acting as superintendent, within the meaning of the employer's liability act. McHugh v. Man. R. R. Co., 179 N. Y. 379, 72 N. E. 312; Faith v. N. Y. C. & H. R. R. Co., 109 App. Div. 222, 95 N. Y. Supp. 774, affirmed 185 N. Y. 556, 77 N. E. 1186; McBride v. N. Y. Tun. Co., 101 App. Div. 448, 92 N. Y. Supp. 282. Illman marked these engines to be dumped, and it was expected this work would be done during the noon hour. The plaintiff's intestate was under the rear engine, as was necessary, hoeing out the ashes into the pit provided for then, when the engines were set in motion by Chamberlain, a hostler, without sufficient warning to Mikos, the decedent, and he was run over and killed. The proof does not disclose precisely how the accident occurred. The bell of the engine was rung just as it started, and it is a fair inference from the evidence that he attempted to escape from his perilous situation, when he was crushed with the drive wheels of the engine. Without detailing the facts and inferences permissible, suffice it to say we think the jury had a right to acquit Mikos of any fault which would prevent the plaintiff recovering in this action.

Chamberlain during the noon hour was eating his luncheon in a shanty 20 or 30 feet from the end of the ashpit, and his business was to move engines from the ashpit when ordered to do so. When he had nearly finished his luncheon, Illman came to the shanty and directed him to remove these two engines. The nub of the litigation is over this direction. Chamberlain was not sworn, and was out of the state at the time of the trial. Brown, a hostler employed by the defendant, was in the shanty with Chamberlain, and testified that Illman came there and "told Chamberlain to take them two engines on that pit over to the coal chute—they were dumped out, and the second engine was disabled; they were both coupled together—take them before they died and get them into the house, so as to make room for the switch engines. * * * Take them. They are ready. * * * The first one was dumped out, and the second one disabled. * * * Take them as soon as possible, before they die, so as to make room for the switch engines coming in there at the dinner hour." Illman disagreed with this version, and said he simply told Chamberlain:

"When those engines are ready, keep them coupled together, and take them off."

The court, in submitting the discrepancy in this testimony to the jury, and its effect as the pivotal question in the case, said:

"Now, gentlemen, if it [the injury to plaintiff's intestate] did occur solely through the negligence of Chamberlain, then the plaintiff is not entitled to recover. But if Chamberlain was negligent, and Illman was also negligent, and the accident would not have happened but for the negligence of Illman in respect to the matter to which I have called your attention, then for that act of negligence upon the part of Illman in the respect to which I have called your attention the defendant is responsible; for at this time he was exercising acts of superintendence as I view the case, and under the law the defendant is liable for such negligence.

The only rule in any way pertinent to this situation was one providing:

"The engine bell must be rung when the engine is about to move."

That rule is of little significance in this case, for Chamberlain rang the bell as his engine started. The evidence showed that it was almost the invariable practice for the engineer, before taking his engine from the ashpit, to look under the engine and ascertain if the hoer had finished the dumping of the ashes, and, if not, to give him personal warning. It is patent that some warning of this kind must be essential to the safety of the men under the engine, rather than to depend for warning upon the ringing of the bell or by sounding the whistle just before starting the engine; and the necessity is more pressing when two engines are coupled together and the workman is under the rear engine.

The crucial question is, therefore, whether Chamberlain was justified in departing from the usual practice because Illman told him the engines were dumped and were ready to be taken out. Illman was the man who represented the defendant. For the purpose of regulating the movements of Chamberlain in handling and removing these engines, he was the defendant. Chamberlain knew that Illman was his superior, and that his special domain was these ashpits and the control of these engines. Illman came directly from the engines. The customary time for dumping them was an hour, and that time had already elapsed. He testified:

"We have strict orders not to delay them any more than we can possibly help; to get them off as quickly as possible."

With this injunction in mind he gave the direction to Chamberlain. We think the hostler had a right to rely on these statements of Illman that the engines "had been dumped and were ready." It is the same as if the defendant, coming directly from the engines, advised the engineer that they had been cleaned and were ready to be removed. They were put in there for the sole purpose of being cleaned under the direction of Illman, and, if he told Chamberlain that the work had been done and they were ready to be removed, the jury certainly had a right to find that Chamberlain was excused from investigating on his own account. He had been instructed by the foreman "to be careful to look around to see it was clear, ring the bell, and also blow the whistle." Illman, his immediate superior, in effect told him there was no need of spending the time to look under the engines or make any personal inspection for they were ready to be taken out. Illman assumed to possess knowledge of the cleaning of the engines and their readiness to be removed.

It certainly would be carrying the rule beyond reason to hold, where the defendant has assumed to say to his servant that every danger has

been removed and to do certain work in reliance upon that statement, the defendant to be absolved from liability because the servant had no right to accept the statement, but must act precisely as if it had not been made. Illman, the representative of the defendant, imparted the information for the benefit of Chamberlain, and gave instructions, expecting them to be obeyed. Chamberlain had a right to accept the facts stated and obey the directions, and the defendant, who interfered and authorized the departure from the prevailing practice, cannot be heard to say its orders should be disregarded, or its information treated as unreliable. Chamberlain finished his luncheon in about five minutes, ran out the engines without investigating at all, and, as a result of this omission, the plaintiff's intestate was killed, and the jury were authorized to impute the blame to the defendant.

The judgment and order should be affirmed, with costs.

Judgment and order affirmed, with costs. All concur, except Mc-LENNAN, P. J., who dissents.

McLENNAN, P. J. (dissenting). The material facts are not in dispute. At about noon on the 21st day of November, 1903, plaintiff's intestate was in defendant's employ, engaged in cleaning ashes from an engine standing over an ashpit in the defendant's yard in the city of Buffalo. In order to perform such service it was necessary to go into the pit and under the engines to be cleaned. While thus engaged the engine under which he was at work was moved, and in attempting to escape he was run over and injured in such manner that he died soon after. The deceased had been in defendant's employ for a considerable time prior to the accident, and was entirely familiar with the method of doing the work in which he was engaged. Concededly, when it was necessary to dump or clean the ashes from an engine, it was run over the ashpit by a "hostler," was marked "dump" by the superintendent or person in charge, and other employés then went under it to hoe out the ashes into the pit. When that was done, a hostler took the engine from the pit. It was the universal custom in defendant's yard, and the hostlers had been instructed, not to move an engine from the ashpit until they had examined to see if any one was under the engine, then to sound the whistle and ring the bell before starting the same, and such instructions had been given to the hostler who moved the engine in question. At the time in question two engines had been placed upon the pit. One was a live engine, the other crippled, both coupled together and only capable of being moved by power from the live engine. These engines had been upon the pit for about an hour, and a Mr. Illman, who was acting as superintendent in respect to the movement of the same, went into a shanty about 25 or 30 feet from the ashpit, where a Mr. Chamberlain and a Mr. Brown, who were hostlers, were eating their dinner, and directed Chamberlain to take the two engines from the pit, stating, as the jury had a right to find, that they had been dumped and were ready to be moved. Illman, then left the hostlers in the shanty eating their dinner, got upon his own engine, and went away. After five or six minutes, when he had finished his dinner, Chamberlain went to the pit to remove the two en-

gines. He made no examination or observation to see whether or not any one was under the engines or in the ashpit, but got into the cab, gave a blast of the whistle, rung the bell, and moved the engines, with the result that the plaintiff's intestate, in attempting to get out of the pit, was crushed under the wheels and killed.

We think the evidence was of such character as to justify the jury in finding that the deceased was free from contributory negligence. The only question left to the jury by the trial court as to defendant's negligence was whether or not Illman, who was then acting as superintendent, was guilty of negligence in stating to Chamberlain, when he directed him to take the two engines from the ashpit, that they had been dumped and were ready. It must be conceded that, if the accident occurred solely because of the negligence of Chamberlain, the plaintiff cannot recover, because he was a co-employé with the deceased, and the trial court so charged. It is equally clear that if it resulted because of the negligence of Illman, or would not have occurred except for his negligence, the defendant is liable, because at the time he was acting as superintendent, and under the employer's liability act his negligence was the negligence of the master. So that the only question presented by this appeal is whether or not it was permissible for the jury to find that Illman was negligent because he directed Chamberlain to take the engines from the ashpit and stated to him at the time in substance that they had been dumped and were ready to be moved. If Chamberlain had followed the express instructions given to him by the defendant and the custom which had been universally adopted in removing engines from the ashpit, the accident would not have happened; for then he would have discovered that plaintiff's intestate was in the pit and would not have moved the engines.

Could Illman have anticipated that his directions and statement would be interpreted by Chamberlain to mean that the engines in question might be moved in violation of the express directions given to him by the defendant and in violation of the custom adopted for doing such work—that he was thereby relieved from making any examination to ascertain whether any one was under the engines before moving the same? If Illman had given the direction and made the statement attributed to him with the engines in his view, or under such circumstances that his order was to be carried out under his observation or immediate direction, another question would be presented. But here the superintendent found the hostler eating his dinner, entirely away from the engines, doing no act in connection with them. Under these circumstances he gave the order directing their removal, stating in substance that they were ready to be removed, and also that it was desirable that they should be moved as speedily as possible. We think such direction and statement should not be construed to mean that Chamberlain was authorized to move such engines, except in the usual manner and in accordance with the directions which had been given him for the performance of such work. After the directions were given by Illman, Chamberlain waited five or six minutes before attempting to move the engines. During that time any employé might have gone into the pit, which only emphasizes the suggestion that the statement, made five or six minutes before, "The engines are ready,"

could not be interpreted as an assurance on the part of Illman that no one was in the pit, and therefore that the hostler was relieved from making an investigation in that regard. Indeed, it very conclusively appears that Chamberlain did not so interpret the statement; for he sounded the whistle and rung the bell, all of which was unnecessary, except for the purpose of warning any person who might be in the pit underneath. The rules in force upon practically all railroads require that, before a standing engine is put in motion, the bell shall be rung. If a superintendent should give an order directing that an engine standing not in his view should be moved, and should state that everything was ready for its starting, could such an order and statement be interpreted by the engineer to mean that he was not required to ring the bell—that it was permissible for him to violate the express rules of the company in that regard?

In the case at bar, if Chamberlain was authorized, by reason of what was said by Illman, to violate the express instructions which required him to look under an engine before moving it from the ashpit, he was equally authorized to omit sounding the whistle or ringing the bell. We think the order given and statement made by the superintendent did not authorize the hostler to move the engines in question, except in the ordinary way and after having taken the precautions imposed upon him by the express instructions of the defendant for the protection of his co-employés, viz., before moving an engine from the ashpit to see that no one was underneath, and then to sound the whistle and ring the bell; that the accident in question resulted solely because of the negligence of Chamberlain in failing to obey such instructions; and that for such negligence the defendant is not liable. Having reached the conclusion that the evidence fails to establish that the superintendent, Illman, was guilty of negligence which caused or in any manner contributed to the accident, it is unnecessary to consider any other of the questions raised by this appeal.

It follows that the judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.