### McGLYNN v. PENNSYLVANIA STEEL CO.

(Supreme Court, Appellate Division, Second Department.    April 7, 1911.)

1. MASTER AND SERVANT (§ 108*)—INJURIES TO SERVANT—EMPLOYER'S LIA-
   BILITY ACT—"WORKS OR MACHINERY."

   In an action for injuries under employer's liability act (Consol. Laws 1909, c. 31), held a cable and its hoisting machinery used in lowering a heavy steel section of a bridge into place were within the term "works or machinery."

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 203; Dec. Dig. § 108.*

   For other definitions, see Words and Phrases, vol. 8, pp. 7524, 7525.]

2. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—EMPLOYER'S LIA-
   BILITY ACT—WORKS AND MACHINERY.

   In an action for injuries under employer's liability act (Consol. Laws 1909, c. 31), held, under the evidence, that the jury might have found there was a defect in the condition of the works or machinery at the time plaintiff, to release a foul, went upon a heavy piece of steel, which was being put in place on a bridge by a cable and derrick.

   [Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

3. MASTER AND SERVANT (§§ 103, 190*)—INJURIES TO SERVANT—DUTY TO IN-
   SPECT.

   In an action for injuries under employer's liability act (Consol. Laws 1909, c. 31), where the evidence showed that it was the custom to test a "load," and, if unsafe the foreman always notified the men to keep away, that such tests were made before the men went to work, and it was the duty of J. to make them, that he could have made the test easily, to see whether the cable was taut or slack, but he omitted to make any

test whatever, or give any warning, and a heavy. piece of steel called a "load" injured plaintiff because the cable holding it was slack, the master is liable, as the duty of inspection is not delegable, and is continuing, according to the circumstances, and the servant upon whom that duty is cast is a vice principal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 175, 465; Dec. Dig. §§ 103, 190.*]

4. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—DANGEROUS MACHINERY—DERRICKS.

Where a foreman ordered plaintiff to go upon a 60 ton steel section, partly resting in place, and partly suspended by a cable attached to a hoisting machine, and release a foul in the joining of that section with another, and plaintiff, while trying to hammer it into place, got his hand caught by such section suddenly falling into place, *held*, under the evidence, that the jury might have found that such sudden impact was fraught with danger, unless restrained by a taut cable, which danger the foreman should have realized, and ascertained whether the cable was taut before sending plaintiff to release the foul.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

5. MASTER AND SERVANT (§ 279*)—INJURIES TO SERVANT—SUPERINTENDENT.

Where plaintiff was ordered by a foreman to go upon a heavy steel section to release a foul in the joining thereof with another section, and was injured, evidence *held* to justify a finding that the foreman was acting as a superintendent, for whose act the master was liable.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 279.*]

6. MASTER AND SERVANT (§ 245*)—INJURIES TO SERVANT—USE OF PARTICULAR TOOLS.

In the absence of specific directions, a general direction is deemed to authorize the doing of a thing in the manner reasonably proper for doing it, and a servant is deemed to have been injured by conforming to an order, where, in carrying out a general direction, he uses the means which to a person possessing his limited knowledge of the conditions it might seem reasonable to adopt under the circumstances, though an expert would have adopted a different method.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 785; Dec. Dig. § 245.*]

7. MASTER AND SERVANT (§ 216*)—INJURIES TO SERVANT—ASSUMPTION OF RISK—ACT OF SUPERINTENDENT.

Where the danger is owing wholly to the isolated act of carelessness by a superintendent, it is not a danger which naturally grows out of the employment, or is necessarily incident thereto.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 570; Dec. Dig. § 216.*]

8. MASTER AND SERVANT (§ 231*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where plaintiff was ordered by defendant's foreman to go upon a heavy steel section to release a foul, and was injured by the section falling into place because not held by the cable, he had a right to assume that defendant had performed his duty to see that a cable partly supporting the section was taut, or, if not, that he would be notified.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 675–677; Dec. Dig. § 231.*]

9. MASTER AND SERVANT (§ 276*)—INJURIES TO SERVANT—EVIDENCE.

Where plaintiff was attempting to hammer a steel section of a bridge so that it would slip into the plates of the other section, and the one he was pounding on was held by a cable attached to machinery, evidence

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*held* sufficient to sustain plaintiff's theory that the accident happened because the cable was slack.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 951; Dec. Dig. § 276.*]

10. MASTER AND SERVANT (§ 252*)—INJURIES TO SERVANT—EMPLOYER'S LIABILITY ACT—NOTICE.

In an action for injuries under employer's liability act (Consol. Laws 1909, c. 31), a notice stating the physical cause of the injury, informing the master as to the particular thing or things out of which the injury resulted, so that he could make the necessary inquiries, is sufficient.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 806; Dec. Dig. § 252.*]

Appeal from Trial Term, Queens County.

Action by John J. McGlynn against the Pennsylvania Steel Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and WOODWARD, JJ.

H. Snowden Marshall, for appellant.

John F. McIntyre (David C. Hirsch, on the brief), for respondent.

JENKS, P. J. This action is brought under the employer's liability act (Consol. Laws 1909, c. 31). The defendant called no witnesses, but examined those of the plaintiff beyond the limits of cross-examination in order to present its case. This employer was constructing a bridge to cross the borough of Manhattan, New York City, to the county of Queens, and the employé was a bridgeman who worked on the metal structure. That work required assembling a section of a steel tower, which section was called "T–4," and which was 16 feet high, 6 or 7 feet wide, and which weighed nearly 60 tons. On December 10, 1907, T–4 had been raised 225 feet above the ground by a steel cable worked over a large steel derrick, whose mechanism included two large drums which were revolved by an engine. This derrick was built upon a traveler which was placed at the center of the bridge on an elevated floor thereof called the second deck. When T–4 had been thus lifted, there were 30 feet of cable between it and the mast of the derrick. T–4 was to rest upon another steel section and to be joined with a steel portal called "B–30." On the side of T–4 were projecting metal strips called angles, which were designed to pass outside of like strips on B–30 called "gusset plates," so that T–4 and B–30 should thereby interlock, and then be riveted or be bolted together as the permanent fabric. When it was attempted to fit T–4 in B–30, a foul occurred—a frequent occurrence. That is, the angles and gusset plates interfered, and would not engage. The result was that although T–4 rested upon the section below it, and at the rear was fastened by bolts and drift pins, at the front it was raised some 3 or 4 inches at its bottom and from 8 to 10 inches at its top. The work had been doing in a storm. At about 11 a. m. the severity of the storm moved Bowers, foreman or superintendent of the defendant, to order the men to quit work for the day. They did so. The steel cable remained fast to T–4 by the lifting device attached to the top, which device also served to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

equalize the strain. After the men had quit work, Bowers examined the cable, and judged that practically the whole "load" (T–4) was hanging on the derrick. Under his direction, the engineer started the machinery of the derrick, and so slacked the cable a "little bit more" until Bowers ascertained that the strain on the derrick had been released "a little." This was customary lest in the interval colder weather might break the cable. On the next morning the plaintiff and his fellows returned to work. Bowers, standing at the lower deck of the traveler, spoke to the plaintiff before the latter went up to the top of the bridge to work. There is a dispute as to what Bowers said. Bowers testifies that he told the plaintiff to tell Johnson that he would get a steamboat ratchet which the plaintiff should use to pull T–4 in. The plaintiff says that Bowers told him to tell Johnson that he (Bowers) was going to send up a steamboat ratchet, but that he did not state the purpose. Johnson corroborates Bowers. A steamboat ratchet is an instrument sometimes used to remove a foul. Bowers testifies that he procured a steamboat ratchet, which he thereafter sent up to Johnson. But meantime plaintiff was carried up to the top of the bridge to work. Johnson was then standing on the traveler, but a few feet away from the section. The evidence for the plaintiff is that Johnson then told plaintiff and his fellows to go up on top of T–4 to try to get it into place. Palmer, a fellow workman, says the order was "to get up there and try to get that piece in." The plaintiff says the direction was "to go on the tower section, and try to get it in position," and Juve, another workman, says the direction was "to go up there, and see if we could not get that section of the tower in place." Johnson cannot remember whether he told the plaintiff anything or not. He cannot remember saying anything to Juve, a fellow workman. He cannot recall what orders he gave on that morning to either of these men. He "remembers nothing about it." Plaintiff and his companions went to the top of T–4. Among the recognized methods of releasing fouls was that of bending the plates by use of hammers, which often proved efficacious. Palmer testifies that:

"The first thing we try to do, and the simple way to get at it, is to take a maul and try to break the foul. That very often has the result of breaking it."

The plaintiff and his companions employed this method. The plaintiff lay upon the top of T–4, plying an eight-pound hammer with his right hand, and clinging to the top of T–4 with his left hand projecting over the edge of T–4. After hammering for a few minutes—one witness estimates the time at five minutes—and when the plaintiff was still at this work, T–4 suddenly fell into place with B–30 with terrific force, and the plaintiff's left hand was cut off as if by the jaws of a trap. Doubtless the hammering released the foul.

There is no blame to be attached to the slack of the cable ordered by Bowers on December the 10th as an isolated act. There is no proof that on the morning of the accident, December 11th, the apparatus of the derrick was not proper of its kind or perfect in its mechanical condition. But the contention of the plaintiff is that T–4 fell suddenly into place because the cable was slack, and did not control it, whereas

it should have been taut to hold T–4 back until, in accord with the proper practice, it would have been lowered into place gradually by release of the cable after signal to the engineer in charge of the machinery of the derrick.

[1] The cable and its machinery were within the term "works or machinery." Yaw v. Whitmore, 46 App. Div. 422, 61 N. Y. Supp. 731, affirmed 167 N. Y. 605, 60 N. E. 1123; McMahon v. McHale, 174 Mass. 320, 54 N. E. 854; Doherty v. Booth, 200 Mass. 522, 86 N. E. 945.

[2] I think that the jury might have found that there was a defect "in the condition of the works or machinery" at the time the plaintiff went upon T–4 to release this foul.

[3] The evidence is that it was the custom to test "a load [and T–4 as held by the cable was called "a load"] before you go about it at all. If it is unsafe, the foreman always notifies the men to keep away;" that such tests were made before the men went to work; that it was the duty of Johnson to make such tests; that he was in a position at this time to test this cable without any difficulty to see whether it was taut or slack; that he omitted to make any test whatever; and that neither he nor any other gave any warning that the cable was slack. The duty of inspection is not delegable, it is continuous according to the circumstances, and the servant on whom that duty is cast is a vice principal of the master. Koehler v. New York Steam Co., 183 N. Y. 1, 75 N. E. 538; McGuire v. Bell Telephone Co., 167 N. Y. 208, 60 N. E. 433, 52 L. R. A. 437.

[4, 5] As I have said, there was evidence that hammering was often efficacious in itself to release a foul. The jury might have found that the sudden impact of a steel section weighing 60 tons falling into place while workmen were upon it, without the restraint of a taut cable, was fraught with a danger to the plaintiff and those upon it or about it, which Johnson should have realized, and that, therefore, he should have ascertained whether T–4 was restrained by a taut cable before he ordered the plaintiff and his fellows to go upon it to work; for the evidence justified a finding that Johnson was a superintendent and acting as such superintendent. Bowers testifies that his own duties were looking after all steel erection on the bridge; that he had "assistant foremen" under him, who acted in his stead during his absence, of whom Johnson was one; and that Johnson's duties were to act in his stead at the front end of this derrick when he was absent. It appears that on this occasion Bowers was not at the place of work, but that Johnson was there, and Bowers' testimony is, "Mr. Johnson was in charge of a gang up at the top of this tower." Bowers terms Johnson "assistant foreman or pusher," and testifies that Johnson sometimes had as many as 100 men under him, on this occasion about 20 men; that Johnson was in charge of a gang under Bowers' direction, who was foreman of the "whole thing." Johnson testifies that he was an assistant foreman; that he gave orders he received from Bowers; that he very often directed the men concerning the work they had to do; that he constantly assigned men to go to various places to work. Palmer, one of the gang that included the plaintiff, testified that John-

son gave orders from time to time to do certain kinds of work; that he gave orders every morning when they started to work. The plaintiff testifies that Johnson was his foreman and had charge of him, gave him instructions and directions to do anything which he found necessary, and that he acted as superintendent over him in the absence of Bowers; ·that he was all the time in the immediate supervision of Johnson; that none other ever directed him in respect to the work he was to do from time to time; and that Johnson gave the instructions concerning the manner and means of doing the work. See Faith v. N. Y. C. & H. R. R. R. Co., 109 App. Div. 222, 95 N. Y. Supp. 774, affirmed 185 N. Y. 556, 77 N. E. 1186; Onesti v. Central New England Railway Co., 121 App. Div. 554, 106 N. Y. Supp. 233; Mikos v. N. Y. Cent. & H. R. R. R. Co., 118 App. Div. 536, 102 N. Y. Supp. 995, affirmed 191 N. Y. 506, 84 N. E. 1116.

[6] I do not overlook the testimony as to the steamboat ratchet. But Johnson ordered the men to the top of T–4 to see whether they could get it into position. There is no evidence that he prescribed any particular method, or that he indicated the use of the steamboat ratchet or any other instrument. Indeed, there is the question whether the plaintiff might not have inferred from the fact that Johnson, although theretofore informed by plaintiff that the steamboat ratchet was to be sent up, when he gave this order, without mention of the ratchet or without waiting for it, intended that plaintiff and his fellows would remove the foul if possible without the aid of that instrument. In any event, the evidence is that the plaintiff and his fellows went at once about the work by a method in recognized use and often effective. Johnson was close at hand. He saw the plaintiff on top of T–4 before the accident. It is almost incredible that he did not know the method in use, when several men were plying eight-pound hammers upon metal for some minutes. There is no evidence that such hammering would have been used for any purpose at that time except to remove the foul. Labatt on Master and Servant, p. 2019, says:

"In the absence of specific directions, a general direction is deemed to authorize the doing of a thing in the manner reasonably proper for doing it. A servant is deemed to have been injured by conforming to an order, where, in carrying out a general direction, he uses the means which, to a person possessing his limited knowledge of the conditions, it might ·seem reasonable to adopt under the circumstances, though an expert would have adopted a different method."

In Grand Trunk Railway Co. v. Weegar, 23 Can. S. C. 427, therein cited, King, J., says:

"Next, was it impliedly involved in the direction that plaintiff might use his fingers? Mr. Justice Burton grounds his dissent upon this that Garland did not direct plaintiff to move the link with his fingers. I think, however, that in the absence of specific direction the general direction authorizes the doing of the thing in the way reasonably proper for the doing of it, and providing that the engine was not to be moved against the car who can say that it was not proper enough to use the fingers? The doing of the act by the use of a pin would be tedious, and I would think almost impracticably so."

[7] In the words of Lathrop, J., in Millard v. West End Street Railway Co., 173 Mass. 512, 53 N. E. 900:

"The danger in this case was owing wholly to an isolated act of carelessness on the part of a superintendent. This is not a danger which naturally grows out of the employment, or is necessarily incident to it. Davis v. New York, New Haven & Hartford Railroad, 159 Mass. 532 [34 N. E. 1070]."

[8] I fail to find any evidence as to the conduct of the plaintiff which would defeat his action as matter of law, or which would warrant us in disturbance of the verdict upon the facts. The plaintiff had a right to assume that the defendant had performed the duties imposed on him by law, or, if not, that he would be notified. Jenks v. Thompson, 179 N. Y. 20, 71 N. E. 266. There is no testimony of any notice or warning to the plaintiff or his fellows that the cable was slack. The plaintiff testifies that he saw that the cable was attached to T–4; that he did not know it was slack; that as far as he observed and knew the cable was taut; and that he believed that it was supporting T–4.

[9] It is contended that the plaintiff's theory of the accident was physically impossible. This, however, assumes that T–4 was prevented from engaging with B–30 simply because the foul held them somewhat apart. The learned counsel for the appellant supports this by the statement:

"It is to be observed that these men [referring to the plaintiff and his witnesses] do not state that T–4 was supported by the cable."

It certainly is contended upon the testimony that, if the cable had been taut, it would have held back T–4. Palmer testifies that a taut cable would keep a piece of steel in position, and, if the cable had been taut, he did not think that T–4 would have slipped in. The plaintiff testified that T–4 appeared hung by the cable that was on it, and that, if the cable had been taut, T–4 would have been kept in position, and would not have fallen forward. This criticism of the appellant was put before the jury upon the examination of Juve, who was likewise injured in this accident:

"Q. (continuing). Let me correct you, and ask you to refresh your recollection. When you first testified, you told us that, as soon as you got up there, you looked around, and saw that the angles were fouled with the gusset plates, didn't you? A. Yes, sir. I hollered down and told Johnson that. I told Mr. McIntyre that when I got those in—these plates pulled together so they would fit, I was going to tell the foreman to let the cable slack, so that the thing would slide together. Q. You would not have done that if it would slide together without any necessity of telling him, would you? A. When it was— Q. Suppose it had slid right together the minute you pulled the thing, you would not have signaled anybody anything? A. It did slide together. Q. Answer the question as I put it to you. If that thing had slid together when you put a bolt in, and bolted the plates in, you would not have signaled anybody? A. It could not go into place. Q. It could not go into place? A. No; not without releasing the load. Q. It could not go into place without releasing the load? A. No. Q. Do you mean to tell me now, Mr. Juve, that if two pieces of iron, one is pushed up against another piece of iron, as you see these two [indicating]— A. Yes, sir. Q. And you take one away, that the other one won't slide into place past it? A. No, sir. Q. You do say that? A. I say it won't slide into place. Defendant's Counsel: That is all. By Plaintiff's Counsel: Q. You told Mr. Marshall that it would not slide into place. Now, tell us why it would not slide into place? A. Because the load would hold it. Q. That is to say, if it were taut? A. It naturally is taut all the time. You have got a load on it. It is supposed to be taut all the time. Q. Please state why it would

not slide in? A. Because the load would hold it. The load is what is attached to the falls. That is, attached to the cable. Q. What do you mean when you say that the load would have to hold it in place? I don't quite grasp that. A. It would stay right where it is at. Q. Do you mean the cable? A. If it stayed right where it is at, the cable has to be taut and fastened. Then it would stay in its place. The Court: The court understands from the evidence that, where the word 'load' is used, it means that the cable is supporting a burden. Q. Is that so, as the court has indicated? A. Yes, sir."

Moreover, the evidence is that directly after the accident the men injured were released from their position by the withdrawal of the T–4 apart from B–30 by the use of the cable. This seems conclusive that the cable at this time did physically control T–4. The criticism of the learned counsel rests upon the law of gravitation. Naturally T–4 would have come to a perpendicular if the section at its base was horizontal, and so presumably would have engaged B–30 when the foul was removed, unless it was held back by some outside force. But the contention of the plaintiff was that the cable constituted the potential outside force that was at hand to have controlled T–4, so that it might have been lowered into place gradually. Evidently the jury did not think that the theory of the plaintiff rests upon a physical impossibility, and we cannot find that their conclusion is opposed to physical laws. See Fox v. Le Comte, 2 App. Div. 61, 37 N. Y. Supp. 316, affirmed on opinion 153 N. Y. 680, 48 N. E. 1104. The learned counsel for the plaintiff lays stress upon a statement elicited from Palmer upon cross-examination:

"There would have been no use of our trying to hammer those things together if the cable had been taut."

When asked upon redirect examination what he meant, the witness answered:

"If the cable was taut, you know it is no use to hammer it any because when you slack the cable it goes naturally."

Palmer had just testified that, if the cable had been taut, it (i. e., T–4) would not slip in. Palmer had been one of the men engaged in hammering, which he testified was a usual and often efficacious method. This testimony may mean that you could not hammer T–4 and B–30 together if the cable had been taut, because the cable would have held them apart, and this is consistent with the second statement that when you slack the cable, it goes naturally. But it is not consistent with his own testimony and that of the other witnesses that you can release a foul by hammering, and that then the cable is relaxed so as to let the two pieces gradually engage.

[10] The notice is, I think, sufficient, in that it states the physical cause of the injury, so that the master is informed "as to the particular thing or things out of which the injury resulted, so that he may make the necessary inquiries as to the fact and its attendant circumstances." Valentino v. Garvin Machine Co., 139 App. Div. 142, 123 N. Y. Supp. 959, and cases cited.

The judgment and order should be affirmed, with costs. All concur.